**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**=============================** :
**UNITED STATES OF AMERICA,** :
                                        :
                                        :
                                  :    **<u>93-cr-180 (KTD)</u>**
        *— versus —*              :
                                          :
                                          :
**RAMZI YOUSEF,** :
                                         :
              **Respondent.**       :
**=============================** :

_____

**MEMORANDUM OF LAW AND EXHIBITS IN**
**SUPPORT OF RESPONDENT'S HABEAS**
**CORPUS PETITION FOR RELIEF**

_____

**LAW OFFICE OF BERNARD V. KLEINMAN, PLLC**
**ATTORNEY FOR RESPONDENT-PETITIONER YOUSEF**
**TWO GANNETT DRIVE**
**SUITE 418**
**WHITE PLAINS, NY 10604**
**TEL: 914-644-6660**
**FAX: 914-694-1647**
**EMAIL: ATTRNYLWYR@YAHOO.COM**

**LAURA G. STURTZ, PARALEGAL**

- 1 -

*The Underlying Facts of Yousef's Conviction*

## WORLD TRADE CENTER BOMBING

On February 21, 1996, a superseding indictment ((S12) 93-cr-180 (KTD)[1]) was filed in the United States District Court for the Southern District of New York, that charged, Ramzi Ahmed Yousef, with criminal acts in the perpetration of the World Trade Center bombing.  Specifically, he was charged with committing certain overt acts in the Southern District of New York and elsewhere, and, following his trial, was found Guilty on all counts on November 12, 1997.

Summary

1.  On September 2, 1992, Ramzi Ahmed Yousef, using an airline ticket issued in the name of "Azan Muhammed" and a fraudulent passport, travelled with a co-conspirator (Ahmad Mohammed Ajaj) from Pakistan to John F. Kennedy International Airport, in Queens County, New York.  Upon his arrival at Kennedy Airport, he was detained by the INS because he did not have an entry visa.  At this point, Yousef requested political asylum.  He was released later the same night and was allowed to enter the country, after being told to return to court for an immigration hearing

2.  Yousef moved into an apartment at 34 Kensington Avenue, Jersey City, New Jersey with another co-conspirator.  On or about November 30, 1992, Mohammed Salameh, using the name "Kamal Ibraham" rented a storage shed from Space Station Storage, located at 69 Mallory Avenue, Jersey City, New Jersey (the "Storage Shed.")

3.  On November 30, 1992, "Kamal Ibraham" ordered certain chemicals, including urea and nitric acid, for delivery to the Storage Shed.

4.  From November 30, 1992, through in or about February 1993, the co-conspirators, including Yousef, entered and exited the Storage Shed.  During this

---

[1] See N. 6 *infra* regarding successive superseding indictment S14, unsealed in April 2011.

time, Yousef moved from Kensington Avenue to 251 Virginia Avenue, Jersey City, and again to 40 Pamrapo Avenue, also in Jersey City.

5. From on or about January 1993, through in or about February 1993, the co-conspirators, including Yousef, mixed chemicals to produce explosive materials, including urea nitrate and nitroglycerine, in an apartment located at 40 Pamrapo Avenue, Jersey City, New Jersey.

6. On February 16, 1993, Yousef and Salameh drove to the World Trade Center to scout the best location to place the bomb.

7. On February 26, 1993, the co-conspirators transported an improvised explosive device that was inside the Ryder van from New Jersey to New York.

8. At 12:18 p.m. on that date, the co-conspirators caused an improvised explosive device that was inside the Ryder van to explode in the garage area beneath the Vista Hotel, located at the World Trade Center complex in New York City, causing personal injury to numerous persons, the death of six persons, and over $500 million in property damage.

9. On February 27, 1993, Yousef, using an airline ticket issued in the name of "Abdul Bassit," boarded a flight from Kennedy Airport to Karachi, Pakistan.

10. Ramzi Ahmed Yousef was soon placed on the FBI's Most Wanted List.

11. On February 6, 1995, an informant phoned the United States Embassy in Islamabad, Pakistan, and subsequently Yousef was arrested by Pakistani authorities and promptly turned over to the United States.

12. Aboard the flight back to the United States, Yousef admitted that he knew Ajaj, and that, while in Pakistan, both men planned to bomb targets in the United States, with the goal of influencing United States policy toward Israel and the Middle East.

13. During this flight, Yousef was also questioned about the "Bojinka" plot (see details below), stating that the flight schedules found on the laptop computer in the Philippines were used to create potential bombing targets, and that electronic Casio watches were to be used as timing devices.

14. Yousef's link to his co-conspirators was established via his own post-arrest statement, co-conspirators' presence at the same locations, eyewitness

identification, fingerprint evidence, phone records, bank records, chemical purchase orders, parking receipts, police reports, rental agreements, computer files, airline records, surveillance videotape from an ATM machine, hospital records, travel agency records, motel ledgers, *etc*.

15. On November 6, 1997, the jury commenced deliberations, concluding on November 12, 1997.  The verdict of the jury was Guilty on all counts.

16. On January 8, 1998, Ramzi Ahmed Yousef was sentenced by this Court to 240 years for his conviction in the World Trade Center bombing.

### PHILIPPINE AIRLINES BOMBING ("BOJINKA" PLOT)

On February 21, 1996, Yousef was indicted on charges comprising nineteen Counts connecting him to the planning of the "Bojinka" attacks and the bombing aboard Philippine Airlines Flight 434 which, when the bomb exploded while the aircraft was in flight, caused the death of one passenger, Haruki Ikegami.

Summary

1. On January 6, 1995, (almost two years after the World Trade Center bombing), a fire broke out in room 603 of the Josefa apartment complex in Manila.  The fire was caused by the bomb-making activities of Yousef and others.

2. The bombs were to be used in a campaign of terror, code-named "Bojinka" — a plot to bomb simultaneously twelve U.S. commercial airliners while in fight over the Pacific Ocean.  The purpose behind the plot, as with the World Trade Center bombing, was to influence United States policy in the Middle East and the United States' relations with Israel.

3. By 3:00 a.m. on January 7, the Philippine National Police ("PNP") and the Presidential Security Group ("PSG") had arrived on the scene.  Both were summoned as Pope John Paul II was scheduled to visit the Philippines and they were responsible for his security.

4. Examination of a seized laptop computer revealed what appeared to be airline flight schedules for three different United States carriers: United, Delta, and

- 3 -

Northwest.  The PNP promptly informed the U.S. Federal Aviation Administration and the FBI.

5.  At trial the Government presented the testimony of 44 witnesses, the majority of whom were police officers and investigators from the Philippines and Japan.

6.  Witness testimony included information about the existence of what were termed "test runs" before the actual "Bojinka" plan was to be executed.

7.  The first test allegedly occurred on December 1, 1994, when Yousef walked into the empty Greenbelt Movie Theater in Manila, planted and then detonated a bomb under one of the seats.

8.  On December 11, 1994, a bomb exploded onboard Philippine Airlines Flight 434, while en route to Narita, Japan from Cebu, Philippines, killing a Japanese passenger.  The plane made an emergency landing in Okinawa.

9.  A flight attendant identified Yousef as a passenger on the first leg of that flight from Manila to Cebu.

10. Evidence found on the laptop computer's hard drive, seized in the Philippines, included scanned pictures of the conspirators, used to make fake passports; flight schedules for the three airlines, all for the same period of time; a fax acknowledging a wire transfer of funds to a Philippine bank; and a letter outlining the plan to blow up the airliners, code-named "Bojinka."

11. When Yousef was arrested in Pakistan, authorities found various passports, Casio watches, and a threatening letter.

12. On September 5, 1996, the jury returned a verdict of Guilty on all counts of the indictment.

13. On January 8, 1998, the Court imposed a sentence of life imprisonment without parole, to run consecutive to the 240 years for the World Trade Center bombing, for Yousef's conviction in the Philippine Airlines indictment.  Furthermore, the Court made recommendations, among others,  regarding Yousef's conditions of confinement, including the place of confinement, and the type of confinement

- 4 -

Currently, Ramzi Ahmed Yousef is serving out his sentence at the Federal Bureau of Prisons supermax facility U.S.P. Administrative Maximum, located in Florence, Colorado ("ADX-Florence").

*Yousef's Legal Argument Challenging Imposition of the Special Administrative Measures*

Petitioner Yousef has been subjected to the Special Administrative Measures since before his incarceration at ADX-Florence. See **Exhibit A** for a copy of the current Special Administrative Measures as applied to Petitioner Yousef. He has, as further set forth below, exhausted his administrative remedies. See **Exhibit B** for a copy of Petitioner Yousef's administrative complaints and the responses of the Bureau of Prisons.**[2]** The gravamen of his complaint, and the basis for this *habeas* petition is that the

---

**[2]** The Administrative Remedy Program can be summarized as follows,

> The Administrative Remedy Program provides every inmate the opportunity to seek formal review of a grievance concerning virtually any aspect of his or her confinement, should informal procedures not achieve resolution. See Administrative Remedy, 28 C.F.R. pt. 542, and Program Statement 1330.13, Administrative Remedy Program. This program applies to all inmates confined in institutions operated by the BOP, inmates designated to contract RRCs, and to former inmates for issues which arose during confinement. Inmates are obligated to attempt informal resolution of grievances prior to filing a formal request for administrative remedy. Once a formal request is filed at the institution level ("BP-9"), the Warden of that facility has 20 days to investigate and provide the inmate a written response. If the inmate is dissatisfied with the Warden's response, he or she has 20 days to file a Regional Administrative Remedy Appeal ("BP-10"). Once received in the Regional Office, the Regional Director has 30 days to investigate and provide the inmate a written response. If the inmate is dissatisfied with the Regional Director's response, he or she has 30 days to file a Central Office Administrative Remedy Appeal ("BP-11"). Once received in the Central Office, the Administrator, National Inmate Appeals, has 40 days to investigate and provide the inmate a written response. After receiving the Administrator's response, the inmate has exhausted the BOP's Administrative Remedy Program. The program provides for expedited investigations and responses in emergency situations, as well as providing extensions of time for both filing grievances and receiving responses.

*Legal Resource Guide to the Federal Bureau of Prisons*, U.S. Dep't of Justice (as revised Nov. 25, 2008), at pp. 34-35. This is the latest version of this document.

Government has failed to adequately set forth the basis for his continued incarceration under the SAMs. After having been in United States custody (and almost the entire time in solitary confinement) for a period of sixteen years, the argument that he is a threat to society, or that there is a substantial risk that his communications will lead to "death or serious bodily injury" tends (to be kind) to become somewhat suspect and clearly merits the impartial and unbiased eye of a federal district court.[3]

Since Mr. Yousef's transfer to ADX the SAMs have been re-upped at every opportunity. Until October 2001 the re-newal came every 120 days, and with the amendment effective after 9/11, the re-newals come every year. Indeed, if the Government could have its way, it would likely place SAMs on inmate Yousef for the rest of his life, and then just not have to go through the apparently meaningless exercise of "justifying" them in one format or another every 365 days. However, this is not what is permitted. The courts have recognized that the SAMs are deemed to be of limited duration for a reason. As this Circuit has put it, "if over time, it appears that [the inmate] no longer poses such a threat to society [as that set forth in § 501.3], various privileges may gradually be restored." *United States v. Felipe*, 148 F.3d 101, 111 (2d Cir.), *cert. denied* 525 U.S. 907 (1998). The rationale here is that

> The limitations in these regulations [part 501 of 28 C.F.R.] imply that
> the Bureau of Prisons could not assign a prisoner directly upon his admis-

---

[3] As the First Circuit put it with regard to the prosecution of Richard Reid (the so-called "shoe bomber"),

> this constant reiteration of we've got to keep data away from him, we've got to
> keep his data out of the hands of the public lest disaster befall, respectfully, is
> wearing a bit thin.

*United States v. Reid*, 369 F.3d 619, 623 (1st Cir. 2004).

sion to the federal prison system to spend the rest of his life in the control unit without the possibility of reconsideration.

*United States v. Johnson*, 223 F.3d 665, 672 (7th Cir. 2000), *cert. denied* 534 U.S. 829 (2001).[4]

What these statements reflect is the fundamental recognition that no matter how heinous the crime or acts of the defendant, he never surrenders his basic rights and protections as set forth in the Constitution.  As the Circuit Court put it in *Felipe*, *supra*,

> Upon entering into confinement, it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system.  But, as the Supreme Court teaches, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." . . .. Thus, it may truly be said that prison walls are not a barrier between a prisoner and protections guaranteed him under the Constitution.  . . .  Prisoners may petition the government for redress of their grievances, are protected against invidious racial discrimination, and are entitled to due process. . . .. Federal courts must uphold a prisoner's exercise of these rights, while also according deference to legislative and executive branch policies designed to address the urgent problems involved in administering a modern-day prison.

148 F.3d at 107-08.  Citations omitted.[5]

---

[4] The Seventh Circuit went on to state that the very fact that placement in a "control unit" needs to be re-newed on a set schedule supports this very conclusion.  223 F.3d at 672, referencing 28 C.F.R. § 541.49(d).  It clearly would be a hollow and meaningless provision if the "review" were to turn into a rubber-stamp process, which it certainly appears to be for inmate Yousef.
  The referenced section provides as follows,
> (d) At least once every 60 to 90 days, the Executive Panel shall review the status of an inmate in a control unit to determine the inmate's readiness for release from the Unit.  The Executive Panel shall consider those factors specified in 541.50(a), along with any recommendations by the unit team and Warden.

[5] In *United States v. Abu Ali*, 528 F.3d 210, 221 (4th Cir. 2008), *cert. denied* — U.S. — (2009), the Fourth Circuit put the issue in a more general context, but still expressing the fundamental principles applicable herein,
> Unlike some others suspected of terrorist acts and designs upon the United States, Abu Ali was formally charged and tried according to the customary

In other words, the fact that inmate Yousef was convicted, in federal trials, of attempting to destroy the World Trade Center (and, in doing so, killing six people and injuring hundreds more), and conspired to destroy aircraft while in the air, and, in planning so, killed an individual, and expressed, at his sentencing certain "hateful" attitudes, cannot and will not serve as a basis to deny him the fundamental rights that we all have.[6]

---

processes of the criminal justice system.  Persons of good will may disagree over the precise extent to which the formal criminal justice process must be utilized when those suspected of participation in terrorist cells and networks are involved. There should be no disagreement, however, that the criminal justice system does retain an important place in the ongoing effort to deter and punish terrorist acts without the sacrifice of American constitutional norms and bedrock values.  As will be apparent herein, the criminal justice system is not without those attributes of adaptation that will permit it to function in the post-9/11 world.  These adaptations, however, need not and must not come at the expense of the requirement that an accused receive a fundamentally fair trial.

In accord see *Brown v. Plata*, — U.S. —, 131 S. Ct. 1910, 1928-29 (2011) ("Courts nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.'  . . . Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  Citation omitted.).

[6] Indictment 93-cr-180 (KTD), was the indictment under which Yousef was tried and convicted in both the 1993 bombing of the World Trade Center and the so-called Bojinka Plot.  In 2009 Superseder 14 to the indictment was filed with the District Court.  See District Court Docket Entry No. 834 (Dec. 14, 2009).  The indictment was unsealed by order of this Court on April 4th, 2011.  See Docket Entry No. 840.  This superseding accusatory instrument separately charged Khalid Sheikh Mohammed, Walid bin Attash, Ramzi bin al-Shibh, Ali Abdul Aziz Ali, and Mustafa al-Hawasi, with multiple counts regarding the 9/11 aircraft hijackings and attacks on the WTC and the Pentagon.  Significantly, this eighty page document, with ten separate counts of terrorism, hijacking, and related offenses, makes absolutely no mention of inmate Yousef.  Indeed, Count Ten, which covers a period "[f]rom in or about 1989 until the date of the filing of this Indictment", and accuses the defendants of membership in al-Qaeda, and of conspiracy to violate 18 U.S.C. § 2332(b), also contains no mention, whatsoever, of Yousef, notwithstanding the fact that it was not until 1995 that he was arrested.
  It should be noted that this indictment was subsequently dismissed with the filing of a *nolle prosequi* on the date of unsealing.  *Ibid*.

Petitioner Yousef's claim is based upon the fact that he has been subjected to Special

Administrative Measures ("SAMs") since 1997, when they were first drafted and issued

by the Justice Department.  See 62 Fed. Reg. 33732 (June 20, 1997).  The regulation,

which appears at 28 C.F.R. § 501.3, was amended only once, in the aftermath of 9/11,

when the Attorney General was given the interim authority to make them individually

effective for up to one year before having to re-up them.  See 66 Fed. Reg. 55065 (Oct.

31, 2001).[7]  The regulation, as set forth in the footnote below, basically provides that the

Attorney General may issue Special Administrative Measures setting forth special

conditions of confinement when there is a finding "that there is a substantial[8] risk that a

prisoner's communications or contacts with persons could result in death or serious

---

[7] The interim rule change made on October 31st, 2001 was finalized on April 4th, 2007.
The Department of Justice, on that date, issued its final rule, discussed some of the
received comments, and explained the basis for whatever changes were effected.  See 72
Fed. Reg. 16271-16275.  See **Exhibit C**.  Outside of the change from 120 days to one
year for extensions, the only other significant change had to do with any SAMs that
impacted attorney-client contact — designated as "Monitoring of Attorney Client
Communications".  The DoJ justification for this change was premised upon *Weatherford
v. Bursey*, 429 U.S. 545 (1977), and the explanation that "Weatherford supports the
concept that when the government possesses a legitimate law enforcement interest in
monitoring detainee-attorney conversations, no Sixth Amendment violation occurs so
long as privileged communications are protected from disclosure and no information
recovered through monitoring is used by the government in a way that deprives a
defendant of a fair trial."  72 Fed. Reg. at 16273.  See 429 U.S. at 558-59.  Whether and
to what extent the Justice Department position is a valid interpretation and application of
*Weatherford* is not the focus of this petition.  See discussion in Yockey, J, *The Case For
Sixth Amendment Public Safety Exception After Dickerson*, 2004 UNIV. ILL. L. REV. 501,
515-17 (2004).  And, it is counsel's belief (or perhaps, hope) that based upon Judge
Cabranes' decision at the sealed hearing of October 18, 2000, no such monitoring of Mr.
Yousef's conversations with counsel herein has taken place.

[8] It should be noted that in the final rule issued in April 2007, the Justice Department
specifically declined to define what constitutes "substantial" as used in § 501.3.  The final
rule used the phrase: "we do not detail 'substantial standards' " to make clear its lack of
clarity.  72 Fed. Reg. at 16274.

bodily injury to persons, or substantial damage to property that would entail the risk of

death or serious bodily injury to persons."  § 501.3(a).[9]  By its very heading —

---

[9] 28 C.F.R. § 501.3 provides as follows,

501.3 - Prevention of acts of violence and terrorism.

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury.  These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.  These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.  The authority of the Director under this paragraph may not be delegated below the level of Acting Director.

(b) Designated staff shall provide to the affected inmate, as soon as practicable, written notification of the restrictions imposed and the basis for these restrictions.  The notice's statement as to the basis may be limited in the interest of prison security or safety or to protect against acts of violence or terrorism.  The inmate shall sign for and receive a copy of the notification.

(c) Initial placement of an inmate in administrative detention and/or any limitation of the inmate's privileges in accordance with paragraph (a) of this section may be imposed for up to 120 days or, with the approval of the Attorney General, a longer period of time not to exceed one year.  Special restrictions imposed in accordance with paragraph (a) of this section may be extended thereafter by the Director, Bureau of Prisons, in increments not to exceed one year, upon receipt by the Director of an additional written notification from the Attorney General, or, at the Attorney General's direction, from the head of a federal law enforcement agency or the head of a member agency of the United States intelligence community, that there continues to be a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.  The authority of the Director under this paragraph may not be delegated below the level of Acting Director.

(d) In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of

"Prevention of acts of violence and terrorism" — it is made clear that it is directed at a

terrorism, the Director, Bureau of Prisons, shall, in addition to the special administrative measures imposed under paragraph (a) of this section, provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

(1) The certification by the Attorney General under this paragraph (d) shall be in addition to any findings or determinations relating to the need for the imposition of other special administrative measures as provided in paragraph (a) of this section, but may be incorporated into the same document.

(2) Except in the case of prior court authorization, the Director, Bureau of Prisons, shall provide written notice to the inmate and to the attorneys involved, prior to the initiation of any monitoring or review under this paragraph (d). The notice shall explain: (i) That, notwithstanding the provisions of part 540 of this chapter or other rules, all communications between the inmate and attorneys may be monitored, to the extent determined to be reasonably necessary for the purpose of deterring future acts of violence or terrorism; (ii) That communications between the inmate and attorneys or their agents are not protected by the attorney-client privilege if they would facilitate criminal acts or a conspiracy to commit criminal acts, or if those communications are not related to the seeking or providing of legal advice.

(3) The Director, Bureau of Prisons, with the approval of the Assistant Attorney General for the Criminal Division, shall employ appropriate procedures to ensure that all attorney-client communications are reviewed for privilege claims and that any properly privileged materials (including, but not limited to, recordings of privileged communications) are not retained during the course of the monitoring. To protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a privilege team shall be designated, consisting of individuals not involved in the underlying investigation. The monitoring shall be conducted pursuant to procedures designed to minimize the intrusion into privileged material or conversations. Except in cases where the person in charge of the privilege team determines that acts of violence or terrorism are imminent, the privilege team shall not disclose any information unless and until such disclosure has been approved by a federal judge.

(e) The affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program, 28 CFR part 542.

(f) Other appropriate officials of the Department of Justice having custody of persons for whom special administrative measures are required may exercise the same authorities under this section as the Director of the Bureau of Prisons and the Warden.

- 11 -

select group of inmates who have either been accused and/or convicted of terrorist related

activities, or have engaged in especially violent behavior. Thus, for example, SAMs have

been made applicable not only to Petitioner Yousef, but also to particularly violent

individuals. *See, e.g., United States v. Mikhel*, 552 F.3d 961 (9th Cir. 2009); *In re*

*Basciano*, 542 F.3d 950 (2d Cir. 2008), *cert. denied sub nom. Basciano v. U.S. Dist.*

*Court for Eastern Dist. of N.Y.*, — U.S. — (2009) ; *United States v. McDonnell*, 2005

WL 1544804 (E.D.N.Y. 2005).

Indeed, the final rule change, made effective in April 2007, discussed the issue of re-

newals or extensions of the SAMs as applied to any inmate. According to the published

statement of the Justice Department,

> The interim rule also modified the standard for approving extensions of
> the special administrative measures. The rule provides that the subse-
> quent notifications by the Attorney General, or the head of the Federal law
> enforcement or intelligence agency should focus on the key factual deter-
> mination -- that is, whether the special administrative measures continue
> to be reasonably necessary, at the time of each determination, because
> there is a substantial risk that an inmate's communications or contacts
> with persons could result in death or serious bodily injury to persons, or
> substantial damage to property that would entail the risk of death or
> serious bodily injury to persons.

72 Fed. Reg. at 16272.

However, this was significantly qualified by the following paragraph which states that

once an initial determination has been made that an inmate is subject to the SAMs, "then

the determination made at <u>each subsequent review should not require a de novo review,</u>

<u>but only a determination that there is a continuing need for the imposition of special</u>

<u>administrative measures in light of the circumstances</u>." *Ibid.* Emphasis added.

- 12 -

In other words, the standard is a lesser one for re-newal or extension, notwithstanding the fact that the impact upon the inmate is precisely the same.  Furthermore, the extension, if any, is "justified" or "merited" "in light of the circumstances" — a wholly undefined phrase.  Additionally, it is wholly unclear what the difference is between "a de novo review" and "a continuing need".  In light of the fact that, from the inmate's perspective there is no difference whatsoever, as the level of treatment is the same on Day 364 of the initial de novo review determination, and on Day 10 of the "continuing need" determination, how the inmate can effectively contest the re-newal is unclear — to say the least.

This clearly raises the issue of the reasonableness of the subject regulation as to how it is determined that inmate Yousef still merits SAM designation.  The DoJ fails to explain how the operative words are to be defined or interpreted.  What this does is leave the petitioner in a situation where he is unable to contest the conclusions of the issuing authority — whomsoever that might be.

As set forth above he has gone through the Administrative Remedies Procedures to no avail.  (And, hence, as set forth *infra*, he is not precluded from bringing this suit jurisdictionally under the Prison Litigation Reform Act.)  Analyzing the amended Section 501.3 under established Supreme Court precedent makes it clear that it cannot stand, or at least certainly as it is applied to this particular inmate.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e is the primary jurisdictional statute for any inmate — federal or state — to challenge his or her

- 13 -

conditions of confinement.[10]  Much of the litigation involving challenges to the Special

Administrative Measures has relied upon this act of Congress to establish jurisdiction of

---

[10] 42 U.S.C. § 1997e provides as follows,

    (a) Applicability of administrative remedies
      No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.
    (b) Failure of State to adopt or adhere to administrative grievance procedure
      The failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under section 1997a or 1997c of this title.
    (c) Dismissal
      **(1)** The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.
      **(2)** In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.
    (d) Attorney's fees
      **(1)** In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that--
          **(A)** the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and
          **(B)(i)** the amount of the fee is proportionately related to the court ordered relief for the violation; or
            **(ii)** the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
      **(2)** Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant.  If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

- 14 -

the district courts to entertain such suits.  As set forth below, Petitioner Yousef, who is

---

**(3)** No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel.

**(4)** Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.

(e) Limitation on recovery

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

(f) Hearings

**(1)** To the extent practicable, in any action brought with respect to prison conditions in Federal court pursuant to section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility, pretrial proceedings in which the prisoner's participation is required or permitted shall be conducted by telephone, video conference, or other telecommunications technology without removing the prisoner from the facility in which the prisoner is confined.

**(2)** Subject to the agreement of the official of the Federal, State, or local unit of government with custody over the prisoner, hearings may be conducted at the facility in which the prisoner is confined.  To the extent practicable, the court shall allow counsel to participate by telephone, video conference, or other communications technology in any hearing held at the facility.

(g) Waiver of reply

**(1)** Any defendant may waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983 of this title or any other Federal law.  Notwithstanding any other law or rule of procedure, such waiver shall not constitute an admission of the allegations contained in the complaint.  No relief shall be granted to the plaintiff unless a reply has been filed.

**(2)** The court may require any defendant to reply to a complaint brought under this section if it finds that the plaintiff has a reasonable opportunity to prevail on the merits.

(h) "Prisoner" defined

As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

- 15 -

here proceeding by way of a *habeas corpus* petition (28 U.S.C. § 2241), takes the

position that (1) the PLRA is inapplicable to his particular suit as he is not challenging

the "conditions of confinement" but, rather, the underlying basis or bases for the

imposition of those conditions (*i.e.*, that he is, in fact, a party subject to the Special

Administrative Measures),[11] (2) in any event this court has jurisdiction under a number of

federal statutes to entertain his lawsuit, and (3) he has, in fact, exhausted all of his

administrative remedies within the Bureau of Prisons ("BOP") administrative remedies

program, and therefore may now seek judicial review of his complaint.

The purpose behind the PLRA was to reduce the ever growing issue of prisoner

lawsuits and to re-invigorate the exhaustion requirement.[12]  See *Porter v. Nussle*, 534

---

[11] While Yousef's "conditions of confinement" are not the primary target of this action, they can be considered a derivative target, as a ruling by the Court that the Government has failed to adequately establish a basis for the imposition of the SAMs will lead to a relaxation of those conditions.  While the SAMs detail Yousef's conditions and treatment in a formalistic agency-speak manner, perhaps the most egregious condition is his solitary confinement — which he has been compelled to endure since his incarceration at ADX-Florence.  This has lasted in excess of fifteen years.  There can be little or no dispute that such long-term treatment, with no hope or prospect of any remedial condition, will lead to severe psychological trauma, and is a violation of the inmate's Eighth Amendment right against cruel and unusual treatment.  See generally *Hilao v. Estate of Marcos*, 103 F.3d 789, 790-91 (9th Cir. 1996); *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988); *Roby v. Dep't of Corrections*, 427 F. Supp. 251 (D. Neb. 1977).

See also discussion in Memorandum of Deputy Ass't Attorney General Steven Bradbury to Sr. Deputy Gen'l Counsel for the Central Intelligence Agency John Rizzo at pp. 21-22, 44-45 (May 10, 2005); Vasiliades, E., *Solitary Confinement and International Human Rights: Why the U.S. Prison System Fails Global Standards*, 21 AM. UNIV. INT'L LAW REV. 71 (2005) (*passim*).

[12] The PLRA, enacted in 1996, was preceded by the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e, *et seq*.  The problem was that this latter statute did not mandate exhaustion of administrative remedies, and contained, what the Supreme Court described as "a limited exhaustion requirement."  See *McCarthy v. Madigan*, 503 U.S. 140, 150-51 (1992).  The result was the proverbial conflict among the circuits, as to what

U.S. 516, 524 (2002). A center-piece of the statute is the requirement that the inmate exhaust his administrative remedies before he proceed in federal court. *Booth v. Churner*, 532 U.S. 731, 739 (2001). Significantly, this is a mandatory requirement — it is not discretionary with the district court. *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").[13] See also *Booth*, *supra*, at 532 U.S. at 741. In addition, this applies to *any* prisoner suit challenging prison conditions (and not just suits under Section 1983). *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Nussle*, *supra*, 534 U.S. at 524. As this is a pleading procedural pre-condition to filing any such lawsuit, the inmate must comply with the available administrative process as set forth in the agency's grievance procedure(s). *Jones*, *supra*, 549 U.S. at 218, citing to, and quoting from, *Woodford*, *supra*, 548 U.S. at 88. See also *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009). Furthermore, this requirement must be met by following the agency's established procedures — informal attempts at administrative resolution of claims involving prison conditions will not suffice. *Macias v. Zenk*, 495 F.3d 37, 42-43 (2d Cir. 2007); *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).

Significantly, the statute, by its very language, is limited to inmate lawsuits "brought with respect to <u>prison conditions</u>". 42 U.S.C. § 1997e(a). Emphasis added. In *Porter*, *supra*, the Supreme Court stated that the phrase "prison conditions," in the PLRA, refers

---

a limited exhaustion requirement entails. Compare *Nussle v. Willette*, 224 F.3d 95, 106 (2d Cir. 2000), with *Smith v. Zachary*, 255 F.3d 446, 448-49 (7th Cir. 2001).

[13] However, this is not treated as a jurisdictional requirement. See *Reed Elsevier, Inc. v. Muchnick*, — U.S. —, 130 S. Ct. 1237, 1247 n. 6 (2010).

to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 534 U.S. at 532. See also *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009); *Abney v. McGinnis*, 380 F.3d 663, 666-67 (2d Cir. 2004). The phrase means precisely what it would appear to mean. It covers, for example, claims as to confiscation of literature (*see, e.g., Roles v. Maddox*, 439 F.3d 1016, 1017 (9th Cir.), *cert. denied* 549 U.S. 905 (2006)), withholding of or poor or inadequate medical treatment (*see, e.g.*, *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004); *Burks v. Nassau County Sheriff's Dep't*, 288 F. Supp.2d 298, 300-01 (E.D.N.Y. 2003)), claims of excessive force by prison officials (*see, e.g., Larkin v. Galloway*, 266 F.3d 718, 723 (7th Cir. 2001), *cert. denied* 535 U.S. 992 (2002); *Wolff v. Moore*, 199 F.3d 324, 328 (6th Cir. 1999)), denial of availability of interpreters for administrative proceedings (*see, e.g., Castano v. Nebraska Dep't of Corrections*, 201 F.3d 1023, 1024 (8th Cir.), *cert. denied* 531 U.S. 913 (2000)), restricting inmate access to telephones (*see, e.g., Perez v. Federal Bureau of Prisons,* 229 Fed. Appx. 55, 58 (3d Cir. 2007)), availability of religious material (*see, e.g., Jensen v. Knowles*, 621 F. Supp.2d 921, 928 (E.D. Cal. 2008)), and placement in solitary confinement or a special housing unit (*see, e.g., Petrucelli v. Hasty*, 605 F. Supp.2d 410, 422 (E.D.N.Y. 2009), *reconsideration denied* 2010 WL 455002 (E.D.N.Y. 2010)).

What it does not cover are actions, such as the one in the case at bar, where the inmate is challenging his or her designation, as being subject to the particular institutional condition, in the absence of due process. While the PLRA will apply to any action initiated by any inmate challenging his conditions of confinement, as effected by the Bureau of Prisons in the implementation of Special Administrative Measures (*see, e.g.,*

*Yousef v. Reno*, 254 F.3d 1214, 1221 (10th Cir. 2001); *United States v. Troya*, 2008 WL 2537145 at *3 (S.D. Fla. 2008); *United States v. Ali*, 396 F. Supp.2d 703, 706-07 (E.D. Va. 2005))[14], the statute does <u>not</u> apply to the actual designation of an inmate as being subject to SAMs.  An inmate's designation is more akin to the manner in which an inmate is subject to the execution of his or her sentence of confinement.  See generally 18 U.S.C. § 3553, the primary federal sentencing statute which requires "individualized sentencing", *i.e.*, the imposition of a sentence that takes into consideration the "the nature and circumstances of the offense and the history and characteristics of the defendant; . . ." *id*. at § 3553(a)(1).  See *United States v. Courtland*, — F.3d —, 2011 WL 1565641 at *7 n. 10 (7th Cir. 2011); *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994) — and thereby invoking the availability of *habeas* relief.  See discussion *infra*.

It is on the aforementioned basis that this Court has jurisdiction to hear this petition. Several federal statutes, therefore, will be deemed to confer this jurisdiction on this court as they serve as the underlying basis for the issuance of the Special Administrative Measures.  See *United States v. Reid, supra*, 369 F.3d at 620; *United States v. Felipe, supra,* 148 F.3d at 109.  Section 3621 of Title 18[15] sets forth the powers and authority of

---

[14] See also, generally, *Sledge v. Wilner*, 2010 WL 717852 (D. Colo. 2010) (collecting cases); *Cushenberry v. Federal Medical Center*, 530 F. Supp.2d 908, 911 (E.D. Ky. 2008); *Ferguson v. Ashcroft*, 248 F. Supp.2d 547, 563-64 (M.D. La. 2003).

[15] 18 U.S.C. § 3621, provides as follows:
> **(a) Commitment to custody of Bureau of Prisons.**--A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.
> **(b) Place of imprisonment.**--The Bureau of Prisons shall designate the place of the prisoner's imprisonment.  The Bureau may designate any available penal or

the federal Bureau of Prisons, as delegated by the Attorney General of the United

States,[16] to specify the facility designation and location of any convicted individual.  18

> correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--
>> **(1)** the resources of the facility contemplated;
>> **(2)** the nature and circumstances of the offense;
>> **(3)** the history and characteristics of the prisoner;
>> **(4)** any statement by the court that imposed the sentence--
>>> **(A)** concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>>> **(B)** recommending a type of penal or correctional facility as appropriate; and
>> **(5)** any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.
>
> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

[16] See 18 U.S.C. § 4001(b)(1), which provides as follows:
> **(b)(1)** The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended and the applicable regulations.

See also *Ponzi v. Fessenden*, 258 U.S. 254, 361-62 (1922); *United States v. Marchese*, 341 F.2d 782, 789 (9th Cir.), *cert. denied* 382 U.S. 817 (1965) ("The federal prison system is operated in all its aspects by . . . the Attorney General, part of the executive branch of the government, and not by the judiciary.  18 U.S.C. 4001."); *Tabor v. Hardwicke*, 224 F.2d 526, 529 (5th Cir. 1955).

U.S.C. § 3621(a), (b).[17]  However, these laws do not grant the Bureau of Prisons totally

unfettered discretion, subject to the PLRA, to designate an inmate as being subject to

certain terms and conditions.[18]  The discretion granted the Attorney General (or his or her

designee) is not unbridled (*see, e.g., Fallis v. United States*, 263 F. Supp. 780 (M.D. Pa.

1967)),[19] and the courts may interfere when such authority is exercised arbitrarily and

capriciously.  *See, e.g., McCloskey v. Maryland,* 337 F.2d 72, 74 (4th Cir. 1964); *Owens

v. Alldridge*, 311 F. Supp. 667, 669 (W.D. Okla.), *aff'd* 432 F.2d 441 (10th Cir. 1970);

*Murphy v. Surgeon General*, 269 F. Supp. 227 (D. Kan. 1967).

    Thus, for example, in *Pimentel v. Gonzales*, 367 F. Supp.2d 365 (E.D.N.Y. 2008),

Judge Garaufis come to the conclusion (as endorsed by numerous other courts)[20] that the

---

[17] See *United States v. Felipe, supra*, 148 F.3d at 109.

[18] In *Tabor*, *supra*, the court stated that
> The control of federal penitentiaries is entrusted to the Attorney General . . . who, no doubt, exercises a wise and humane discretion in safeguarding the rights and privileges of prisoners . . .
224 F.2d at 229.

[19] See also *Adams v. Carlson*, 352 F. Supp. 882, 889 (E.D. Ill.), *vacated and remanded on other grnds*. 488 F.2d 619 (7th Cir. 1973), speaking of prison discipline being "largely" within the discretion of prison administrators.

[20] In discussing the particular issue in the case at bar, the district court laid out, in detail, the numerous decisions, within this Circuit, that have similarly held that the execution of a sentence, *i.e.*, the manner in which a sentence of incarceration is implemented, is a matter for *habeas* review, *viz.*,
> [T]his court finds that Pimentel appropriately proceeded through Section 2241 and that his failure to exhaust his administrative remedies is excused.  Courts within the Second Circuit have consistently recognized subject matter jurisdiction over actions brought under Section 2241 that challenge the validity of the December 2002 Policy, and more recently, the February 2005 Rule.  *See, e.g., Franceski v. Bureau of Prisons,* No. 04 Civ. 8667, 2005 WL 821703, at *3-4 (S.D.N.Y. 2005) (* * *); *Cohn* [*v. Federal Bureau of Prisons*]*,* 302 F. Supp.2d [267] at 270 [(S.D.N.Y. 2004)] ("A petition for a writ of habeas corpus under 28 U.S.C. §

denial of an inmate's <u>qualification for being designated as placement in a Community

Correction Center</u> (pursuant to 18 U.S.C. §§ 3621(b), 3624(c)), is a matter properly

challengeable in a *habeas* petition.  The rationale of the court was that this designation is

a matter concerning the <u>execution</u> of the sentence, and is therefore properly challenged

under Section 2241, Title 28 (*i.e.*, in a *habeas* petition).  *Id.* at 370.

   The district court, significantly, relied upon the Supreme Court's decision in *Preiser*

*v. Rodriguez*, 411 U.S. 475 (1973).  *Preiser* is the seminal case involving whether actions

commenced by inmates, that challenge particular aspects of inmate confinement and con-

ditions, may be brought under the federal *habeas corpus* statute.  Writing for the major-

ity, Justice Stewart opined that state inmates, who seek to challenge the deprivation of

good-time credit,[21] are required to commence their suit under Section 2241 of Title 28

---

   2241 is the proper vehicle for challenging the execution of the sentence of a per-
   son in federal custody, or a person sentenced for violating a federal criminal
   statute."); *Chambers v. United States,* 106 F.3d 472, 474-75 (2d Cir. 1997) ("A
   challenge to the *execution* of a sentence ... is properly filed pursuant to Section
   2241.") (emphasis in the original); *Yip* [*v. Federal Bureau of Prisons*]*,* [367 F.
   Supp.2d 548] at 550-51 [(E.D.N.Y. 2005)]; *Drew* [*v. Menifee*]*,* 2005 WL 525449
   at *1 [(S.D.N.Y. 2005)]; *Pinto* [*v. Menifee*]*,* 2004 WL 3019760 at *3 [(S.D.N.Y.
   2004)]; *Terry v. Menifee,* No. 04 Civ. 4505, 2004 WL 2434978 at *2 (S.D.N.Y.
   Nov. 1, 2004) ("This court has subject matter jurisdiction pursuant to 28 U.S.C.
   §§ 2241 and 1361"); *Crowley* [*v. Federal Bureau of Prisons*]*,* 312 F. Supp.2d
   [453] at 455 [(S.D.N.Y. 2004)]; *Distefano v. Federal Bureau of Prisons,* 2004
   WL 396999, at *2 (S.D.N.Y. Mar. 4, 2004); *Loeffler v. Menifee,* 326 F. Supp.2d
   454, 456 (S.D.N.Y. 2004); *Zucker* [*v. Menifee*]*,* 2004 WL 102779 at *3
   [(S.D.N.Y. 2004)]; *Adler v. Menifee,* 293 F. Supp.2d 363, 366-67 (S.D.N.Y.
   2003).  Indeed, the government does not cite to a single case within this Circuit
   that rejected a prisoner's challenge to either the December 2002 Policy or the
   February 2005 Rule for lack of jurisdiction under Section 2241.
367 F. Supp.2d at 370.

[21] In *Preiser* the action arose out of a challenge by an inmate at a New York State correc-
tional facility.  The petitioner sought review of the agency's manner in which he was

rather than the federal civil rights act, 42 U.S.C. § 1983.  The reason being that *habeas*

*corpus* is, by definition, the exclusive remedy for inmates to challenge (a) either the fact

of their incarceration (*i.e.*, to contest the conviction in the trial court), or (b) the duration

of their confinement.  411 U.S. at 487-88.  In coming to this conclusion, the majority

warned that while "§ 1983 is a proper remedy for a state prisoner who is making a

constitutional challenge to the <u>conditions of his prison life</u>, but not to the fact or length of

his incarceration.  . . . . This is not to say that habeas corpus may not also be available to

challenge such prison conditions.  . . .  <u>When a prisoner is put under additional and</u>

<u>unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will</u>

<u>lie to remove the restraints making the custody illegal.</u>"  *Id*. at 499.  Footnote, citations

omitted.  Emphasis added.

The key factor for this court is not that *Preiser* abrogated the exhaustion requirement

— for it did not.  See *Heck v. Humphrey*, 512 U.S. 477, 481-82 (1994).  Rather, it is that

an inmate who is seeking monetary damages for his confinement conditions is obligated

to pursue his action under Section 1983.  *Id*. at 481.  In accord see *Hardy v. Fischer*, 701

F. Supp.2d 614, 620 (S.D.N.Y. 2010).  In the case at bar, Petitioner Yousef does not seek

damages either for his conditions of confinement, or even for his designation as an

inmate subject to the Special Administrative Measures.[22]  Rather, what Yousef seeks, is a

---

deemed to qualify for "good time" credit to his imposed sentence under the relevant state
law — N.Y. Correction L. § 803.

[22] While Petitioner Yousef does not seek damages for the unlawful imposition of SAMs
upon him, this does not mean that he waives any such right, with prejudice, to such
damages that might be awarded by the Court.  The deprivation of fundamental due pro-
cess may well serve as the basis for damages if it is found that the Petitioner has been
wrongfully subjected to the restrictions imposed under the SAMs.  See generally *Ustrack*

constitutionally based due process challenge to his actual designation as a person subject to the SAMs, *i.e.*, the right to discover why he has been designated a SAM-eligible inmate, and the concomitant right to challenge that designation through discovery and an evidentiary hearing. While such an action may lie under Section 1983, it can equally (if not more so) lie under the *habeas corpus* statute. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Court held specifically and unequivocally that an action challenging the constitutionality of state parole procedures may lie under either the Civil Rights Act of 1871 (*i.e.*, 42 U.S.C. § 1983), or under a petition for *habeas* relief. 544 U.S. at 76. It is only, and exclusively, where the inmate is challenging the very fact of his conviction or the length of his confinement that he is restricted to Section 2241, *et seq*. *Id*. at 78.[23]

The Court further possesses jurisdiction to hear Mr. Yousef's petition based upon Section 4042, Title 18.[24] This is a catch-all section of the criminal code granting the

---

*v. Fraiman*, 742 F.2d 573, 578 (7th Cir.), *cert. denied* 479 U.S. 824 (1986); *Soto v. Lord*, 693 F. Supp. 8, 22-23 (S.D.N.Y. 1988). But compare *Royal v. Kautzky*, 375 F.3d 720, 724 (8th Cir. 2004).

[23] While the Supreme Court case law speaks of actions that will affect the actual incarceration (and the obverse — "release") of the inmate (*see, e.g., Wilkinson, supra*, 544 U.S. at 82; *Presiser*, *supra*, 411 U.S. at 489), that is not at issue here. Inmate Yousef is serving a sentence of life plus 240 years. His conviction has been affirmed by the Second Circuit, and *cert*. has been denied by the Supreme Court. See *United States v. Yousef*, 327 F.3d 56 (2d Cir.), *cert. denied sub nom. Ismoil v. United States,* 540 U.S. 993 (2003). The actual success of Yousef's petition will not "necessarily imply" the invalidity of his conviction. See *Skinner v. Switzer*, — U.S. —, 131 S. Ct. 1289, 1299 (2011). However, it does imply the issue of the validity of both the Justice Department and, as a direct result flowing therefrom, the actions of the Federal Bureau of Prisons. With this designation validity at issue, Petitioner's action will properly lie under Section 2241, *et seq*.

[24] The statute, 18 U.S.C. § 4042, provides as follows, in relevant part,
   **§ 4042. Duties of Bureau of Prisons**
   **(a) In general.**--The Bureau of Prisons, under the direction of the Attorney General, shall--

- 24 -

Attorney General the power to direct the federal Bureau of Prisons to manage and regulate the federal prison system, including the implementation of Special Administrative Measures.  See *United States v. Felipe*, *supra*, 148 F.3d at 109.

This statute, as with Sections 3621 and 4001, is not limitless in its scope. It is subject to the normal constraints of the United States Constitution and federal statutory law. *Mathews v. Hardy*, 420 F.2d 607, 610 (D.C. Cir. 1969), *cert. denied* 397 U.S. 1010 (1970).  It is fundamental that prison authorities may only issue and enforce regulations that are reasonable under the circumstances.  *Phillips v. Bureau of Prisons*, 591 F.2d 966, 972 (D.C. Cir. 1979); *Vida v. Cage*, 385 F.2d 408, 409 (6th Cir. 1967); *Muniz v. United States*, 280 F. Supp. 542, 547 (S.D.N.Y. 1968).

It is important to recognize that the test of "reasonableness" is not one that is peculiar to the prison system, or that requires a specially defined test of reasonableness.  In *Pell v. Procunier*, 417 U.S. 817 (1974), the Supreme Court was asked to rule on the constitution- ality of prison regulations that limited inmate access to the media.  The question involved a balancing of the inmates' First Amendment rights with the need for the penological

---

**(1)** have charge of the management and regulation of all Federal penal and correctional institutions;
**(2)** provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
**(3)** provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;
**(4)** provide technical assistance to State, tribal, and local governments in the improvement of their correctional systems;
**(5)** provide notice of release of prisoners in accordance with subsections (b) and (c);
\* \* \*

system to provide for the safety and security of both inmates and staff.  417 U.S. at 822.

In ruling on the particular regulation involved in the case, Justice Stewart applied the general test applicable to any attempt by the government that either infringes upon, or has the potential for infringing upon the regulated parties fundamental constitutional rights.

Here the Court relied upon the discussion of reasonable exercise of state police power as set forth in *Grayned v. City of Rockford*, 408 U.S. 104 (1972).[25]  *Grayned* involved a challenge to a municipal ordinance that criminalized the actions of a party who made excessive noise in proximity to a school while in session, and that prohibited any non-labor/union based picketing within one hundred feet of a school while in session.   The ordinances were challenged on both First Amendment and vagueness grounds.  In partially striking down these ordinances, Justice Marshall wrote that

> The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.'

408 U.S. at 116.  Footnote and citation omitted.


In *Pell*, *supra*, Justice Stewart relied upon this precise language in ruling on the reasonableness of the subject regulation.

---

[25] The Court relied upon, and cited to, several additional cases — none of which involved prison regulation — but all of which involved municipal/governmental regulation that arguably infringed upon a party's constitutional right[s]. *Adderley v. State of Florida*, 385 U.S. 39 (1966), *reh'g denied* 385 U.S. 1020 (1967), concerned a challenge to a state law used to prosecute students for trespass when they were protesting race-based segregation in city jails; *Cox v. State of Louisiana*, 379 U.S. 536 (1965), concerned a state law under which protesters against segregation were arrested  in the state capitol; and *Cox v. State of New Hampshire*, 312 U.S. 569 (1941), was concerned with a state law under which members of a distinct religious group were arrested for failing to get a license for a parade.  While none of these cases involved prison regulation, they all involved government regulation of private conduct, and set forth a universal standard for the test of reasonableness.

> The 'normal activity' to which a prison is committed - the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence - necessarily requires that considerable attention be devoted to the maintenance of security.  Although they would not permit prison officials to prohibit all expression or communication by prison inmates, security considerations are sufficiently paramount in the administration of the prison to justify the imposition of some restrictions on the entry of outsiders into the prison for face-to-face contact with inmates.

417 U.S. at 826-27.

In accord see *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1029-30 (2d Cir. 1985).

And, subsequent cases have relied upon *Grayned, et al.*, in ruling on the validity — and reasonableness — of prison regulations.  *See, e.g., Farid v. Ellen*, 593 F.3d 233, 242 (2d Cir. 2010); *Chatin v. State*, 1998 WL 196195 at *6 (S.D.N.Y. 1998), *aff'd sub nom. Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999); *Grant v. Riley*, 1993 WL 485600 at *3 (S.D.N.Y. 1993); *Richardson v. Coughlin*, 763 F. Supp. 1228, 1235 (S.D.N.Y. 1991), *aff'd sub nom. Richardson v. Selsky*, 5 F.3d 616 (2d Cir. 1993).

Jurisdiction further lies in this Court pursuant to that provision of the U.S. Code that grants the heads of the various federal departments the power to issue rules and regulations to implement legislation which the departments are charged with enforcing. The statute, 5 U.S.C. § 301, provides as follows,

> The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

It is deemed that pursuant to this statute the Attorney General possesses the authority to issue regulations regarding the administration of federal prison facilities and inmates.[26] See generally *Georgia v. United States*, 411 U.S. 526, 536 (1973) (and cases cited therein); *In re Attorney General of United States*, 596 F.2d 58, 62 (2d Cir.), *cert. denied sub nom. Socialist Workers Party v. Attorney General of United States*, 444 U.S. 903 (1979).  More specifically, this act of Congress is deemed to grant the Attorney General, as the head of the Department of Justice, the power and authority to issue the Special Administrative Measures.  *United States v. Reid*, 514 F. Supp.2d 84, 86 (D. Mass. 2002).[27]  The SAMs, like any other agency or departmental regulation or rule, may only be issued (with limited exception) pursuant to the Administrative Procedure Act ("APA").  5 U.S.C. § 551, *et seq.*  See generally *Berg v. Obama*, 574 F. Supp.2d 509, 519 (E.D. Pa. 2008), *aff'd sub nom. Kerchner v. Obama,* 586 F.3d 234 (3d Cir. 2009), *cert. denied* — U.S. — (2010).  As such the rules and regulations of the Bureau of Prisons are subject to the APA's notice and comment rulemaking requirements.  See *United States v. Sawyer*, 521 F.3d 792, 794 (7th Cir. 2008); *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1239 (10th Cir. 2005).

---

[26] This, needless to say, is based upon the authority granted to the Attorney General over the federal the Bureau of Prisons.  See 18 U.S.C. §§ 3621, 4042, discussed *supra*.

[27] Although the District Court in the *Reid* case stated that Section 301 was a general authorizing statute with regard to the SAMs, the particular SAMs involved (*i.e.*, those related to inmate Richard Reid) were issued at the request of the U.S. Marshals Service.  The statutory authority there was 28 U.S.C. § 561.  See *Reid*, *supra*, 514 F. Supp.2d at 86 n. 4.  This is the general enabling statute for the Marshals Service, and merely sets it forth as one of numerous entities reporting to the Attorney General.  See 28 U.S.C. § 561(a), (b).  See generally *United States v. Hoy*, 137 F.3d 726, 731 (2d Cir.), *cert. denied* 525 U.S. 850 (1998)

The regulations involved here, both the Special Administrative Sanctions rule (28 C.F.R. § 501.3), and the administrative remedy program, have all been enacted through the requisite procedures of the APA.  Guidance as to the position of the SAM rule can be found in, not only the Comments filed with the agency (*i.e.*, the Justice Department), but also with related position and policy memoranda issued by the Department.  With regard to the application of the SAMs to inmate Yousef, the starting place is the very language of the subject section — 28 C.F.R. § 501.3.  The regulation is, by its very language, limited to individuals under the custody and care of the Bureau of Prisons,[28] when there is a finding "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  § 501.3(a).  See N. 9 *supra* for the full language of the regulation.  The SAMs are to be issued by the Attorney General,[29] and implemented by the Director of the

---

[28] Although not necessarily of direct relevance to the case at bar, the courts have interpreted the subject regulation applicable to both convicted inmates (*e.g.*, Petitioner Yousef), and pre-trial detainees.  *See, e.g. United States v. Ali, supra*, 396 F. Supp.2d at 708; *United States v. Reid*, 214 F. Supp.2d 84, 90-91 (D. Mass. 2002).

See generally *Basciano v. Lindsay*, 530 F. Supp.2d 435 (E.D.N.Y. 2008), *aff'd sub nom. Basciano v. Martinez*, 316 Fed. Appx. 50 (2d Cir. 2008), *cert. denied* — U.S. — (2009); *Al-Owhali v. Ashcroft*, 279 F. Supp.2d 13, 16-17 (D.D.C. 2003).

However, the relevance to the case at bar is more related to the widespread use of this regulation — on both convicted and innocent individuals — with little, or no supervision or limitations.

[29] The rule permits the Attorney General to delegate issuance authority to "the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, . . ."  § 501.3(a).  Neither of these terms is defined in the rule.  However, upon information and belief, the SAMs applicable to inmate Yousef emanate from, and are issued by, the U.S. Attorney for the Southern District of New York.  Since inmate Yousef has been represented by counsel herein, said counsel has always dealt directly with the U.S. Attorney, S.D.N.Y., on these issues and has always (going as far back as March 1998) received the scheduled re-upping of the SAMs from the aforemen-

Bureau of Prisons. *Ibid.* Thus, the regulation itself makes the clear distinction between the actual issuance of the SAMs, and their implementation, *i.e.*, the Attorney General issues the order, and the BOP enforces it. The BOP may not, therefore, impose SAMs without their having first been a finding by the Attorney General that "special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." *Ibid.*

The actual internal procedure, referenced above, is set forth in the U.S. Attorney's Manual,[30] ch. 9-24.000, Requests for Special Confinement Conditions Under § 501.3.[31]

---

tioned office of the U.S. Attorney. It should be noted, however, and as will be referenced in the further discussion of the procedures for issuing the SAMs, that counsel herein has, on occasion, dealt with the Office of Enforcement Operations of the Justice Department ("OEO"). In fact, at the July 28th, 1999 telephonic hearing conducted by the Hon. Jose Cabranes, then Assistant U.S. Attorney David Kelley represented to the Court that Mr. Yousef's SAMs are issued by the OEO, then headed by Michael Brave, Esq. Counsel herein, furthermore, on several occasions (the last one being August 1st, 2001) dealt with the OEO on several SAM-related matters. However, not since then has there been any contact with the OEO; all contact being with the U.S. Attorney, S.D.N.Y.

[30] According to the U.S. Attorney's Manual,

> **It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.**

Manual at § 1-1.100. Emphasis in original.

Notwithstanding this statement, there is authority for the proposition that a party may rely upon an agency's internal operations procedures, as set forth in a manual, and, more specifically, those set forth in the U.S. Attorneys Manual. See *United States v. Lee*, 89 F. Supp.2d 1017 (E.D. Ark. 2000), where the district court, in a death penalty case, held that the Defendant has a legitimate right to rely upon and enforce the procedural decision-making provisions of the Manual,

> [I]t is abundantly clear that an individual has the right to force an administrative agency to follow its own procedural rules, even when those rules are contained in an internal manual and are more stringent than the broad authority given to that agency, if the decision made under those rules will affect the individual's rights. In the aforementioned cases, the courts applied this doctrine when the individual rights affected were citizenship, employment, and eligibility for general assistance benefits. In the present case, the right affected is the most fundamental right —

the right to life.  Hence, this Court concludes that because Defendant Lee's right to life will be affected by the Attorney General's decision whether to withdraw or decertify the death penalty notice, he has a right to require the Attorney General to follow her self-imposed procedures found in the Protocol before she makes that substantive decision.

*Id*. at 1036.  Footnotes omitted.

See also *United States v. Ferguson*, 2008 WL 113660 at *1 (D. Conn. 2008).

See generally B. Green & F. Zacharias, *The U.S. Attorneys Scandal and the Allocation of Prosecutorial Power*, 69 OHIO STATE LAW J. 187, 190-91 (2008); L. Beck, *The Administrative Law of Criminal Prosecution: The Development of Prosecutorial Policy*, 27 AM. UNIV. L. REV. 310, 315 (1978).

*Cf.*, *United States v. Fish*, 2006 WL 3731292 (W.D.N.Y. 2006), where the district court refused to apply the rules of the U.S. Attorneys Manual to suppress defendant's grand jury testimony.  The district court did, however, state the following, which should, minimally, serve as some guidance to this court,

Nothing herein is intended to express approval of the government's failure to follow DOJ procedures.  This Court agrees with the Sixth Circuit's admonition that "[t]he government should apply all its rules in a consistent manner with respect to targets appearing before the grand jury." [*United States v*.] *Myers*, 123 F.3d [350] at 358 [(6th Cir. 1997)].  Doing so not only ensures that all defendants will stand as equals under the law, but also that courts will not be burdened needlessly with having to address a host of constitutional questions that could easily have been avoided had proper procedures been followed.

*Id*. at *12 n. 9.

But see *United States v. Aleynikov*, 737 F. Supp.2d 173, 183-84 (S.D.N.Y. 2010) (court refusing to hold that the U.S. Attorneys Manual has the force and effect of law).

**31** The Manual provides as follows:

**9-24.100: Procedures for Requesting Special Confinement Conditions for Bureau of Prisons Inmates Whose Communications Pose a Substantial Risk of Death or Serious Bodily Injury to Persons**

Pursuant to 28 C.F.R. § 501.3, which became effective on May 17, 1996, the Attorney General may authorize the Director of the Bureau of Prisons (BOP) to implement "special administrative measures" upon written notification to BOP "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  The regulation provides that such notification to BOP may be provided by the Attorney General, "or, at the Attorney General's direction by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community."  These special administrative measures ordinarily may be imposed "may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the

telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism."

Although 28 C.F.R. § 501.3(a) allows *notification* to BOP by the Attorney General, or at the Attorney General's discretion, by the head of a federal law enforcement agency, or the head of a member agency of the intelligence community, that an inmate's ability to communicate with other persons may create a substantial risk of death or serious bodily injury, only the Attorney General is authorized to *direct* the BOP to implement the special administrative measures with respect to an inmate. Accordingly, the following measure will apply whenever a federal law enforcement agency, which for these purposes includes a United States Attorney's Office, or a member agency of the intelligence community (hereafter "requesting entity") believes that special confinement conditions are necessary to prevent an inmate from inciting or ordering persons (whether inside or outside a BOP facility) to commit crimes that entail the risk of death or serious bodily injury or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

    A. The requesting entity will submit a letter or memorandum to the Attorney General setting forth the request which must include:

        ° A full and complete statement of the inmate's background and proclivity for violence or for ordering or inciting crimes of violence.

        ° A discussion of why special measures should be implemented.

        ° A description of what special measures (e.g., no visitors except attorneys, no contact with the news media) should be imposed with a justification for each.

    B. The requesting agency's correspondence to the Attorney General will be sent to the Director's Office of Enforcement Operations (OEO) in the Criminal Division for processing.

    C. OEO will obtain from BOP, in writing if necessary, a summary of the inmate's current confinement conditions (e.g., a statement that the inmate is already in segregation for violation of BOP rules), any special needs of the inmate (e.g., special medical or religious requirements), and other information necessary to indicate clearly to the Attorney General how the inmate's confinement conditions would be altered by the imposition of the requested special administrative conditions.

    D. If the requesting agency is a U.S. Attorney's Office, OEO will obtain from the FBI or other involved law enforcement agency a statement of concurrence with or objection to the proposed special administrative measures. To facilitate the FBI's response, a U.S. Attorney's Office submitting a request for special confinement conditions should contact FBI field personnel likely to be familiar with the inmate to inform them of the pending request and to allow them to discuss the request with FBI headquarters.

    E. OEO will prepare a decision memorandum from the Criminal Division to the Attorney General discussing the requesting entity's request for special

This Manual lists six steps necessary for the Attorney General to issue SAMs related to a

particular inmate.**32**  In summary the steps are as follows:

    A.  The requesting party must detail why the SAMs are necessary for the inmate
and what they should contain.

    B.  This request is sent to the Attorney General, who then forwards it to the
Director of the OEO.**33**

---

    administrative measures with a recommendation of action to be taken by
the Attorney General.

    F.  In instances in which the Criminal Division recommends that the Attorney
General direct BOP to impose special administrative measures, the
Criminal Division will prepare a memorandum from the Attorney General
to the BOP setting out the measures to be implemented and the
notification to be given the inmate.  The inmate shall be notified of all
special conditions and the basis therefor at the time they are imposed.
However, the regulation provides, in part 501(3)(b), that the reasons for
imposing the special conditions "may be limited in the interest of prison
security or safety or to protect against acts of violence or terrorism."

**32** These six steps make clear the need for discovery in this case.  Much of the process
involves internal memoranda, recommendations, *etc*. regarding the request for and
drafting of the subject SAMs.  Whether this inmate (*i.e.*, Petitioner Yousef) merits the
imposition of the SAMs can only be fully determined if the entire process, as set forth
herein, is fully examined and the petitioner and his counsel are granted access to the
relevant documents and permission is granted to examine, under oath, the relevant
Executive Branch personnel, no matter what agency with which they are employed.

**33** The Office of Enforcement Operations performs the following functions according to
the website for the Department of Justice:

    The Office of Enforcement Operations (OEO) oversees the use of the most
sophisticated investigative tools at the Department's disposal.  It reviews all
federal electronic surveillance requests and requests to apply for court orders
permitting the use of video surveillance; provides legal advice to federal, state,
and local law enforcement agencies on the use of federal electronic surveillance
statutes; and assists in developing Department policy on emerging technologies
and telecommunications issues.  It authorizes or denies the entry of all applicants
into the federal Witness Security Program (WSP), coordinates and administers
matters relating to all aspects of the WSP among all Program components, and
approves or denies requests by federal agencies to utilize federal prisoners for
investigative purposes.  The Office approves or reviews matters such as witness
immunity requests, transfer of prisoners to and from foreign countries to serve the
remainder of their prison sentences, attorney and press subpoenas, applications for

C.  The OEO is to receive information form the BOP regarding the inmate's current conditions of confinement, and how they would be altered by the SAMs.

D.  If the request originates with a U.S. Attorney's office (as it is believed it does with regard to inmate Yousef), the OEO is to contact the FBI for any input.

E.  The OEO then prepares a "decision memorandum" for submission to the Attorney General.

F.  The Criminal Division of the DoJ is to prepare a recommendation to the BOP on what conditions of confinement the SAMs should include.

As this summary makes clear, and even more so the actual procedure delineated by the Justice Department, there is an extensive deliberative process (or at least there should be one) before the SAMs are imposed and then re-upped.  As was stated above, this deliberative process must be made available to the Petitioner in order to make a reasonable challenge to the decision of the Attorney General; hence the request for discovery in this matter.

Notwithstanding both the regulatory requirement of providing an adequate explana-tion for the continued imposition of the SAMs and the constitutional due process require-ment for doing so, the Justice Department has failed to adequately explain the continued

---

S Visa status and disclosure of grand jury information.  It provides legal advice and assistance in a wide variety of matters, such as crimes affecting government operations, mental competency and insanity, and interstate property crimes.  The Office processes all requests for Criminal Division records made pursuant to the Freedom of Information Act and Privacy Act, and assists U.S. Attorneys' Offices in advocating the Division's position in civil litigation filed under these statutes. It registers entities as required by the Gambling Devices Act of 1962.
*http://www.justice.gov/criminal/oeo/*
It is part of the Criminal Division, and, hence, reports to the Assistant Attorney General ("AAG") with jurisdiction over the Criminal Division.  Interestingly, the "official" description of the OEO contains no reference whatsoever to the SAMs.

rationale for Section 501.3(a)'s persistent application to inmate Yousef. In a number of other cases where the SAMs have been applied, the facts have apparently satisfied the requirement of establishing the SAMs' use to prevent injury or harm to others. *See, e.g., United States v. Reid, supra*, 369 F.3d at 623 (inmate expressing continued and ongoing hostility towards the United States); *In re Basciano, supra*, 542 F.3d at 954 (inmate allegedly preparing a list of names of persons to be targeted {characterized as a "hit list"}, including an Assistant U.S. Attorney, a federal judge, and three co-operating witnesses); *Hale v. Ashcroft*, 683 F. Supp.2d 1189, 1199 (D. Colo. 2009) (letter from inmate to his mother directing that his letter be published in a newspaper); *United States v. Hashmi*, 621 F. Supp.2d 76, 79 (S.D.N.Y. 2008) (SAMs imposed based upon (a) defendant's membership in al-Qaeda, (b) his willingness to permit co-conspirators to store terrorist related gear in his home, (c) his willingness to permit use of his cell phone by others to contact al-Qaeda members and supporters, and (d) his post-arrest statements of his desire to kill U.S. soldiers); *United States v. McDonnell, supra*, 2005 WL 1544804 at *2 (defendant's tampering with the judicial system in attempting to bribe jurors and threaten witnesses). See also *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir.), *cert. denied* 531 U.S. 881 (2000) (Circuit upholds imposition of SAMs based upon "ample evidence of the defendant's extensive terrorist connections.").

And, in all of the aforementioned cases the actions of the inmate that were deemed to merit SAMs treatment were relatively contemporaneous to their arrests, trials, convictions, or designation to a BOP facility. In the case at bar, as was stated earlier, Petitioner Yousef has been incarcerated at ADX for sixteen years. It would not be such a stretch to assume that most, if not all, of the "terrorist" connections he had in the early 1990s are

- 35 -

either dead or in jail.  In fact, none of the relevant agencies (FBI, BOP, U.S. Attorney's Office, OEO) have demonstrated that inmate Yousef has had any contact with any alleged terrorists since his incarceration.  Beyond the fact that most, if not all, of the convicted "terrorists" are housed at ADX-Florence, inmate Yousef has no way of contacting anyone at all.  And, the idea that he could use coded messages through newspaper articles or letters to the editor, or some such other means is beyond the height of absurdity.  The Government's willingness to ascribe to Ramzi Yousef almost mystical and supernatural abilities to frustrate normal BOP security procedures would be funny if it were not true that they apparently seem to believe this.  Ramzi Yousef is not some sort of "MacGyver" able to fashion some incendiary device out of paper clips and chewing gum.[34]  He has neither the ability to walk on water nor is he some sort of alchemist who can fashion gold out of lead.  After sixteen years in federal solitary confinement, he poses no threat to anyone whatsoever such that imposition of the SAMs are still necessary.  And, he is certainly incapable of passing information (assuming that he possesses any at all) via published articles in newspapers or magazines.

There is no question that the normal security procedures applied in a federal penitentiary would serve the same purpose of removing any risk of substantial injury or death as a result of his condition of confinement.  Indeed, if one were simply to review the BOP regulations for Control Unit inmates (see 28 C.F.R. §§ 540.40 through 540.52) it would be clear that these rules, in and of themselves, provide an extraordinary level of security.

---

[34] See the *Online Slang Dictionary*, which defines the verb "to Macgyver", as follows: "to solve a problem in a creative, resourceful, typically 'jury-rigged' fashion." *http://onlineslangdictionary.com/meaning-of/macgyver* . See also: *http://www.wordnik.com/words/MacGyver*

Yet, even "normal" BOP rules for inmates in general population in USPs demonstrates

that there is an enormous level of security to preserve the safety and security of both

inmates and staff.  For example, 28 C.F.R. § 540.14, which covers inmate mail, provides

that

> staff shall open and inspect all incoming general correspondence.
> Incoming general correspondence may be read as frequently as deemed
> necessary to maintain security or monitor a particular problem confronting
> an inmate.

§ 540.14(a).

Furthermore, inmates in maximum security facilities have severe limitations upon

their outgoing mail, *viz*.,

> Except for special mail, outgoing mail from a sentenced inmate in a
> medium or high security level institution, or an administrative institution
> may not be sealed by the inmate and may be read and inspected by staff.

§ 540.14(c)(2).

Finally, the warden, or his designee, is granted broad discretion in controlling inmate

mail as follows,

> The Warden may reject correspondence sent by or to an imate [*sic*] if it is
> determined detrimental to the security, good order, or discipline of the
> institution, to the protection of the public, or if it might facilitate criminal
> activity.  Correspondence which may be rejected by a Warden includes,
> but is not limited to, correspondence which contains any of the following:
> (1) Matter which is nonmailable under law or postal regulations; (2)
> Matter which depicts, describes, or encourages activities which may lead
> to the use of physical violence or group disruption; (3) Information of
> escape plots, of plans to commit illegal activities, or to violate Bureau
> rules or institution guidelines; (4) Direction of an inmate's business . . .

§ 540.14(d).

Clearly this regulation provides a more than adequate basis for protecting inmates, staff and the public from any nefarious activities in which inmate Yousef may engage. Furthermore, other regulations of the Bureau of Prisons (*see, e.g*., 28 C.F.R. § 540.15 regarding "General Correspondence"; §§ 540.18, 540.19, and Part 543, subpart B, regarding attorney-client correspondence; § 540.47, and subpart E, of Part 540, regarding access to and contact with the media;[35] § 540.71, which grants the Warden extensive authority to reject or limit inmate access to outside publications, see § 540.71(b), (c), (d); § 540.102, which grants the Warden authority to monitor inmate telephone calls) provide additional adequate security.[36]

Similarly, general BOP regulations provide for limits on attorney/inmate contact where the attorney engages in activity

> which violates Bureau regulations or institution guidelines and which threatens the security, good order, or discipline of the institution is grounds for limitation or denial by the Warden of the attorney's privileged visitation and correspondence rights.  Acts by an attorney which may warrant such limitation or denial include, for example the following: (1) A false statement as to the attorney's identity or qualifications; (2) A plan, attempt, or act to introduce contraband into the institution; (3) A conspiracy to commit, an attempt to commit, or the actual commission of an act of violence within an institution; and (4) Encouraging an inmate to violate the law, Bureau of Prisons rules, or local implementing guidelines.

---

[35] Indeed, 28 C.F.R. § 540.63(g)(4), provides as follows, granting the Warden, effectively, broad discretion in access to the media,
> The interview, in the opinion of the Warden, would endanger the health or safety of the interviewer, or would probably cause serious unrest or disturb the good order of the institution.

[36] The regulation, in relevant part, provides as follows,
> The Warden shall establish procedures that enable monitoring of telephone conversations on any telephone located within the institution, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.

28 C.F.R. § 543.14(a).

In other words, the basic regulations of inmates held in maximum security facilities would certainly appear to satisfy all of the requirements for safety and security that the SAMs do, but without the punishing nature thereof.

Directly related to the above-referenced regulations is the argument of the Petitioner that this court should apply a rule of lenity in reviewing the manner in which the SAMs are applied to inmate Yousef.  The rule of lenity provides that any statutory ambiguities are to be resolved in favor of the defendant.  See generally *Babbitt v. Sweet Home Chap. of Communities for a Greater Oregon*, 515 U.S. 687, 704 n. 18 (1995); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, *reh'g denied* 468 U.S. 1227 (1984).  The Supreme Court has made it clear that the rule applies not merely to the interpretation of federal laws criminalizing conduct, but also to the penalties imposed thereunder.  *Bifulco v. United States*, 447 U.S. 381, 387 (1980).  In accord see *United States v. Rodriguez*, 553 U.S. 377, 405 (2008); *Sash v. Zenk*, 428 F.3d 132, 134 (2d Cir. 2005), *reh'g denied* 439 F.3d 61 (2d Cir.), *cert. denied* 549 U.S. 920 (2006); *United States v. Koehler*, 973 F.2d 132, 135 (2d Cir. 1992).[37]  However, only where there exists a "grievous ambiguity or uncertainty in the statute" will the rule of lenity be applied.  *Muscarello v. United States*, 524 U.S. 125, 139 (1998).  In accord see *Barber v. United States*, — U.S. —, 130 S. Ct. 2499, 2508-09 (2010); *United States v. Hayes*, 555 U.S. 415, —, 129 S. Ct. 1079, 1088-89 (2009).

---

[37] *Cf., Dolan v. United States*, — U.S. —, 130 S. Ct. 2533, 2544 (2010).

Only where a party is attempting to "engraft an illogical requirement to its text" will an otherwise ambiguous statute (or rule) be subject to the rule of lenity. *Salinas v. United States*, 522 U.S. 52, 66 (1997). In accord see *United States v. Gitten*, 231 F.3d 77, 81-82 (2d Cir. 2000).

The question, of course, is then whether the rule of lenity may be applied to rules and regulations of an agency (in this case Section 501.3). While the Supreme Court has not directly ruled on the issue, there is language that supports such an interpretation. In *Moskal v. United States*, 498 U.S. 103 (1990), Justice Marshall, in quoting from *Bifulco, supra*, observed that the rule of lenity has "always [been] reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Id*. at 108. On this basis a number of Circuit Court decisions by the Second Circuit have resolved issues regarding the Sentencing Guidelines. *See, e.g., United States v. Roberts,* 442 F.3d 128, 130-31 (2d Cir. 2006) (court declining to apply rule of lenity to U.S.S.G. § 2K2.1 solely on the basis that there exists no "grievous ambiguity" to the subject Guideline section); *United States v. Simpson*, 319 F.3d 81, 86-87 (2d Cir. 2002); *United States v. Rivera*, 1996 WL 626397 at *2 (2d Cir. 1996), *cert. denied sub. nom. Leon v. United States*, 519 U.S. 1155 (1997).

See also *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994); *United States v. Martinez*, 946 F.2d 100, 102 (9th Cir. 1991).

*Cf., United States v. Canales*, 91 F.3d 363, 367 n. 4 (2d Cir. 1996).

But see *United States v. Pacheco-Leon*, 1995 WL 595565 at *1 (2d Cir. 1995), where

the Court of Appeals stated that "The rule of lenity applies only to ambiguous criminal

statutes; it does not apply to administrative statements that have no binding legal force."

Since 28 C.F.R. § 501.3 is a regulation that has been adopted pursuant to the Administra-

tive Procedure Act, through the requisite notice-and-comment process (see discussion

*supra*),**38** it is binding on all parties (including the agency) having the "force and effect of

law".  See generally *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *United*

*States v. Nixon*, 418 U.S. 683, 695-96 (1974); *Williams v. Pierce*, 708 F.2d 57, 63-64 (2d

Cir. 1983) (dissenting op., Mansfield, CJ), *cert. denied* 464 U.S. 1046, *reh'g denied* 465

U.S. 1055 (1984).  Hence, the rule of lenity <u>would</u> apply to it.

Applying the rule of lenity would be especially the case where the subject rule or

statute is not *ejusdem generis*, noting the almost singular and atypical nature of Section

501.3, and the fact that the subject words (*e.g.*, "death or serious bodily injury",

"substantial risk", *etc*.) have no elucidation from either their preceding or succeeding

words.  See generally *Washington State Dep't of Social and Health Serv. v. Guardianship*

*Estate of Keffeler*, 537 U.S. 371, 384-85 (2003).  Thus, as in the case at bar, the

Government's mere waving the well-worn flag of "national security" should not be a

sufficient basis for applying the SAMs to inmate Yousef.

The most recent Special Administrative Measures were issued on or about November

19th, 2010.  See **Exhibit A**.  As can be seen from the originating "Memorandum", they

apparently emanate from the office of the Assistant Attorney General for the Criminal

---

**38** See 5 U.S.C. § 553.

Division, Lanny Breuer, and bear a photocopy of his initials.  This would be consistent

with the procedures set forth in the U.S. Attorneys Manual as set forth and discussed

*supra*.  See N. 31, and accompanying text.  Interestingly, and without any explanation

thereof, the SAMs sent to counsel herein had a portion excised.  This is obvious from

what is designated as "Page 2" of the Special Administrative Measures forwarded to

counsel herein by the U.S. Attorney's Office for the Southern District of New York.[39]  In

the 2009/2010 SAMs the introductory Memorandum from the AAG provided what was

---

[39] The SAMs contained the language "LIMITED OFFICIAL USE" at the footer of each page.  This designation was first used in the 2009-2010 SAMs, and did not previously appear.  Precisely what this means is unclear.  Counsel has been unable to find out what this phrase means within the Department of Justice, the Criminal Division, the OEO, or the U.S. Attorney's Office.  However, some guidance might be provided by the Department of Homeland Security ("DHS"), Management Directive System MD 11042, issued on May 11th, 2004.  This was a directive issued by the DHS "regarding the identification and safeguarding of sensitive but unclassified information".  See ¶ 1, therein.  See *http://www.fas.org/sgp/othergov/dhs-sbu.html* .

As set forth in the DHS statement,

> Other government agencies and international organizations may use different terminology to identify sensitive information, such as "Limited Official Use (LOU)," and "Official Use Only (OUO)."  In most instances the safeguarding requirements for this type of information are equivalent to FOUO [For Official Use Only].  However, other agencies and international organizations may have additional requirements concerning the safeguarding of sensitive information.  Follow the safeguarding guidance provided by the other agency or organization.  Should there be no such guidance, the information will be safeguarded in accordance with the requirements for FOUO as provided in this manual.  Should the additional guidance be less restrictive than in this directive, the information will be safeguarded in accordance with this directive.

*Id*. at ¶ 6.C.2.

The FOUO designation is defined as "unclassified information of a sensitive nature, not otherwise categorized by statute or regulation, the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of Federal programs, or other programs or operations essential to the national interest."  *Id*. at ¶ 4.

As with much of the secretive treatment of matters concerning inmate Yousef, no explanation for this designation of the SAMs is provided.  Indeed, there is nothing in the SAMs that states that the contents therein are to be treated as confidential.

apparently an explanation as required under § 501.3 to justify imposition of the SAMs.

Mr. Breuer wrote,

> BOP inmate Ramzi Ahmed Yousef (Yousef) has been convicted of various terrorism-related crimes, including participation in a conspiracy which carried out the 1993 bombing of the World Trade Center in New York City.  Because of Yousef's proclivity for terrorism, the Attorney General placed Yousef under SAM, originally effective August 26, 1996. These SAMs were most recently extended in November 2008.
> Based upon information provided to me of Yousef's proclivity for violence, I find that there is a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.

The Court is asked to compare this statement of the Department of Justice with that issued on August 6th, 1999, by then Attorney General Janet Reno, as to the re-newal of the SAMs for inmate Yousef for a then rule limited period of 120 days.  Attorney General Reno justified the extension of the SAMs based upon the following rationale,

> Yousef was convicted of various terrorist acts, including participation in a seditious conspiracy which carried out the bombing of the World Trade Center in New York City.
> Because I have been informed of Yousef's proclivity for terrorism, I signed a memorandum dated August 26, 1996, in which you [*i.e*., the Director of the Federal Bureau of Prisons] were directed, pursuant to 28 C.F.R. § 501.3, to implement SAM to restrict Yousef's access to the mail, the media, the telephone and visitors. . . .
> As detailed in prior SAM memoranda, Yousef has personally carried out, and has had others carry out, sophisticated and deadly terrorist attacks.  The substantial risks posed by Yousef as set forth in the prior SAM memoranda continue to exist.  Therefore, based upon the information provided to me, I find that there is a substantial risk that Yousef's communications or contacts with persons could result in death or serious bodily injury . . .

Memorandum from Attorney General Janet Reno to Federal Bureau of Prisons

Director Kathleen Hawk Sawyer, Aug. 26, 1999.  See **Exhibit D**.

- 43 -

In both cases — ten years apart — the proffered justification for the SAMs is completely the same. It is conclusory in nature, and apparently relies solely upon inmate Yousef's conviction for the 1993 WTC bombing, along with whatever other acts of alleged terrorism in which he may have engaged prior to his incarceration in February 1995.[40] This denominated act of "terrorism" (*i.e.*, the WTC bombing) occurred in February 1993 — more than eighteen years ago. If this is the basis for the finding of inmate Yousef's "proclivity for violence", then there would be no reason, whatsoever, to assume that the SAMs would be re-newed every year for the rest of his natural life. The fact of his conviction, before this Court, is not in dispute. Inmate Yousef does not deny this, and the petition does not challenge that conviction. If the findings and conclusions of a jury, in 1996 are the basis for the imposition of the SAMs, they always will be. Just as they served as a basis in 2009, they will in 2019, 2029, *etc*. This Court is reminded of the First Circuit's comment in *United States v. Reid, supra*, that continued government assertions of dangers to the public, at a certain point, begin to wear thin. See N. 3 *supra,* and accompanying text.

---

[40] Instructive for the Court is comparing the behavior of inmate Yousef with that of similarly situated inmates. In *Ayyad v. Holder*, 05-cv-2342 (D. Colo.), inmates Nidal Ayyad and Mahmud Abouhalima filed Section 1983 suits challenging their conditions of confinement under the imposed SAMs and the limitations on communications contained therein. In the Government's Motion for Summary Judgment, besides citing their respective convictions in the S.D.N.Y. in the 1993 World Trade Center bombing, the Government also referenced alleged contacts, while at ADX in 2004, by the Plaintiffs, with Mohamed Achraf, the leader of a Spanish terrorist group, "Martyrs for Morocco". The Government contended that the Plaintiffs had corresponded with him and other foreign terrorists then being held in Spanish prisons. See Gov't Motion for Summary Judgment, Docket Entry No. 259 (Mar. 25, 2011) at pp. 5-8.

No such allegations exist as to inmate Yousef.

What the AAG is doing is further punishing inmate Yousef for conducted for which he was convicted almost two decades ago.  While certainly not dispositive on the issue, there are numerous examples of statues, rules, and regulations that place a limit on how far in a defendant's past the Court can go in imposing some sort of penalty or punishment.  For example, U.S.S.G. § 4A1.2, dealing with Criminal History Category, limits the period to within fifteen years of the conviction which is currently before the court.  See sub-section (e)(1).  The rationale being that conduct committed within the fifteen year period is more likely to be an indicator of recidivist behavior, than conduct more than fifteen years old.[41]  See generally *United States v. Guajardo*, 950 F.2d 203 (5th Cir. 1991), *cert. denied* 503 U.S. 1009 (1992).  Similarly, under Rule 609(b) of the Federal Rules of Evidence for the purposes of attacking the truthfulness of a witness, convictions more than ten years old are generally inadmissible.  The rationale here was that convictions greater than ten years of age "do not have much probative value", and should only be admitted in "exceptional circumstances".  See S. Rep. No. 93-1277, P.L. 93-595, 93d cong. 1st Sess. (Oct. 11, 1974).[42]  See *United States v. Brown*, 409 F. Supp. 890 (W.D.N.Y. 1976), where the district court commented on the "pertinency" of old convictions as being probative of a witness's truthfulness.  *Id*. at 894-95.  And, in the immigration context, the Court of Appeals has upheld an Immigration Judge's finding, in review of a denial of asylum application, that, in the absence of any evidentiary support, it was implausible to grant an asylum application based upon alleged qualifying persecution

---

[41] Assuming, *arguendo*, the scientific validity of such a numerical categorization.

[42] In accord see *Scotto v. Brady*, 410 Fed. Appx. 355, 360 (2d Cir. 2010).

that took place more than fifteen years previously. *Hamid v. Holder*, 350 Fed. Appx. 556 (2d Cir. 2009).**43**

Nevertheless, the Government would have this Court uphold continued application of the SAMs based upon conduct that took place more than eighteen years ago.

In inmate Yousef's exhaustion of the administrative process with regard to the SAMs, he filed a Central Office Administrative Appeal (form BP-231(13)) on or about November 4th, 2010.**44** See **Exhibit B**. In that Appeal inmate Yousef challenged the prior responses of the BOP to the continued imposition of the SAMs. The Appeal was received on or about November 10th, 2010. In the response of the agency, dated February 23rd, 2011, from Harrell Watts, Administrator, National Inmate Appeals, the petitioner was informed that

> The basis for implementation of the SAM restrictions is the need to protect others against the risk of death or serious bodily injury. Your SAM was imposed on August 26, 1996, because the Attorney General determined that there was a substantial risk that your communications or contacts with others could result in death, serious bodily injury or substantial damage to property that would entail risk of death or serious bodily injury. The SAM was imposed to implement procedures and restrictions that are reasonably necessary to protect against these risks.

---

**43** The Court stated as follows,

> The IJ also reasonably found implausible that Pakistani authorities would still be interested in Hamid despite his departure fifteen years ago. Although a finding of implausibility must not be based on flawed reasoning, "bald" speculation, or conjecture, . . . ., we will not disturb an implausibility finding if it is "tethered to record evidence, and there is nothing else in the record from which a firm conviction of error could properly be derived."

350 Fed. Appx. at 358.

**44** This Appeal was the last stage of the administrative review process. See description at N. 2 *supra*. The Appeal to the Central Office is the highest level at which an inmate may file an appeal with the BOP.

This language is, first of all, merely a paraphrasing of the language in the subject regulation, *i.e.*, § 501.3(a).  Furthermore, it is wholly conclusory.  There is no explanation as to <u>why</u> inmate Yousef is a "substantial risk".  Apparently, the Justice Department believes that merely by saying so, it will make it true.  Unfortunately, for the Government, this is not how the system works, and it cannot serve as a basis for the imposition of the SAMs.  See generally *Monserrate v. New York Senate*, 599 F.3d 148 (2d Cir. 2010), holding that due process required that legislative body provide more than mere notice of expulsion of member, but also factual basis therefor.  *Id*. at 158-59.[45]  In other words, and as set forth *supra*, the gravamen of inmate Yousef's complaint is that he has been denied Notice as to the basis or bases for the imposition of the SAMs, and has received fundamentally no redress through the administrative remedy program.  See discussion *supra*, and **Exhibit B**.

## *Summary and Relief Requested*

The issue and question then presents itself as to what Remedy can this forum provide to him?  First and foremost, he, and his counsel, must be provided with the reasons that the Attorney General, or his lawful designee, have decided that he is subject to the provisions of § 501.3(a).  As the SAMs, as laid out in **Exhibit A**, make clear, there is no basis for them; they are merely a *fait accompli*.  But, if we go a bit further, and review the responses of the Bureau of Prisons (as set forth in **Exhibit B**) it is clear that that the position of the BOP (*i.e.*, the Justice Department) is that Yousef is subject to Section 501.3(a) due to his convictions in the mid-1990s.  From that fact with which Yousef

---

[45] See also *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995) ("mere conclusory allegations . . . in legal memoranda are not evidence . . .").

certainly does not contest, the Justice Department takes the leap that he is one whose "communications or contacts with others could result in death, serious bodily injury or substantial damage to property that would entail risk of death or serious bodily injury." Why one should lead to the other is not explained. It is as conclusory a statement as one can possibly find, and is, in and of itself, no evidence that would support imposition of the SAMs. See generally cases decided under 18 U.S.C. § 3553(c), vacating sentences for failure to state, in open court, the reason and bases for the imposed sentence, *viz., United States v. Carter,* 489 F.3d 528, 539-40 (2d Cir. 2007), *cert. denied sub nom. Bearam v. United States*, — U.S. — (2008); *United States v. Alcantara*, 396 F.3d 189, 206 (2d Cir. 2005); *United States v. Molina*, 356 F.3d 269, 276-277 (2d Cir. 2004)). Counsel has laid out how, in other cases (*see, e.g*., *United States v. Mikhel, supra*; *In re Basciano, supra*; *United States v. McDonnell, supra*), there are specific acts, statements, or behavior that "merit" SAMs treatment.[46] Yet, Yousef's "acts" are those that occurred when Bill Clinton was President, "twitter" was not a proper noun, and no one had heard of or knew what "social media" was. As set forth above, to rely upon such events merely

---

[46] There has been discussion in Congress, the Executive Branch, and reports by NGOs regarding the so-called radicalization of Islamic inmates, such that the U.S. Prison system can become a breeding ground for terrorist and terroristic behavior. *See, e.g., Prisoner Radicalization*, FBI Law Enforcement Bull. (Oct. 2010); *Terrorist Recruitment in American Correctional Institutions*, Nat'l Criminal Justice Reference Serv. (Office of Justice Programs, U.S. Dep't of Justice, Dec. 2007); *Prison Radicalization: Are Prison Cells Forming in U.S. Cellblocks*, Hearing Before the Comm. On Homeland Security and Governmental Affairs (109th Cong., 2d Sess., Sept. 19, 2006); *Out of the Shadows: Getting Ahead of Prisoner Radicalization*, Special Report by George Washington Univ. Homeland Security Policy Inst. & Univ. of Virginia Critical Incident Analysis Group (Sept. 19, 2006). While these studies and reports discuss a number of incidents involving specific inmates (*e.g*., Youseff Fikri, Jamal Ahmidan, Richard Reid and Sheik Omar Abdul Rahman, and so-called home-grown terrorists), there is no mention, whatsoever of any reports of any illicit activity by inmate Yousef.

means that Yousef will be subject to the SAMs for the rest of his life, and never be able to avoid their imposition.

Yet even were the Justice Department to specify certain acts or actions that inmate Yousef has allegedly committed while incarcerated, additional questions will arise.  First of all, if any of these occurred prior to the present SAMs, why were they never brought forth as reasons for imposing the SAMs?  If they pre-date the current SAMs has the Government, effectively, waived them as a basis for imposing the SAMs?  Are there, as set forth *supra*, less draconian methods to control the cited behavior (assuming that there is any such cited behavior)?  Have these alleged acts been aberrational, or one-time incidents, or have there been repeated acts of a similar nature?  What is the proof or evidence that the Justice Department has that Yousef actually committed any such acts?  If the "proof" is merely an assertion by the BOP or some such other agency this cannot suffice.  In other words how reliable is this evidence, and can it withstand the independent review of an unbiased forum, *i.e.*, this Court?  And, are these "acts" ones that Section 501.3 is designed to address?

In any event, Yousef certainly must be accorded discovery in the form of both deposition and document discovery that the Government may be in possession of that allegedly supports their position.[47]  At a minimum, counsel should be granted permission to take

---

[47] The Government here cannot hide behind any claim that these materials are in any manner classified and that counsel may not be permitted access, even under a protective order.  Counsel, in his preparation of Yousef's appeal was granted access to any number of documents and reports that were deemed under seal.  Indeed, the issue arose at Yousef's appeal regarding certain actions of the Justice Department associated with the Scarpa fiasco when Yousef was being held at the MCC.  See *United States v. Yousef*, *supra*, 327 F.3d at 166-70.  Certainly, in order to avoid any such repetition the Justice

the sworn testimony of a number of parties, including, but not limited to, at the BOP, the

U.S. Attorney's Office for the Southern District of New York, the Department of Justice

Office of Enforcement Operations, and (if necessary) the FBI.  Indeed, in a number of

suits that have been filed in the District of Colorado challenging the conditions of con-

finement imposed under the SAMs (as opposed to the basis for the imposition of the

SAMs — Yousef's suit here — the plaintiffs have been granted both forms of discovery.

*See, e.g., Ayyad v. Gonzales, et al.*, 05-cv-2342, Dist. of Colorado, Discovery Order of

MJ Watanabe (Entry No. 93), Apr. 23, 2007; *Abouhalima v. Gonzales, et al.*, 05-cv-2643,

Dist. of Colorado, Discovery Order of MJ Hegarty (Entry No. 111), Nov. 6, 2006.


In *Wolff v. McDonnell*, 418 U.S. 539 (1974), perhaps the seminal case on prisoner

rights, the high Court, in an opinion by Justice White, made clear that when a person is

incarcerated in a penal institution, he or she does not forfeit their constitutional rights,

including the right to due process of law, *viz*.,

> Petitioners assert that the procedure for disciplining prison inmates for
> serious misconduct is a matter of policy raising no constitutional issue.  If
> the position implies that prisoners in state institutions are wholly without
> the protections of the Constitution and the Due Process Clause, it is plain-
> ly untenable.  . . .  [T]hough [a prisoner's] rights may be diminished by the
> needs and exigencies of the institutional environment, a prisoner is not
> wholly stripped of constitutional protections when he is imprisoned for
> crime.  There is no iron curtain drawn between the Constitution and the
> prisons of this country.  . . .  They retain right of access to the courts.  . . .
> <u>Prisoners may also claim the protections of the Due Process Clause.  They
> may not be deprived of life, liberty, or property without due process of
> law.</u>

*Id*. at 555-56.  Citations omitted.  Emphasis added.

---

Department should be required to provide substantial proof as to why any relevant
document should be denied to Yousef counsel and his CJA approved staff.

See also *District Attorney's Office for Third Judicial Dist. v. Osborne*, — U.S. —, 129 S. Ct. 2308, 2335 (2009) ("It is far too late in the day to question the basic proposition that convicted persons . . . retain a constitutionally protected measure of interest in liberty, . . .").

Entering ADX-Florence with a life sentence does not mean that inmate Yousef has surrendered any of his fundamental rights, including that to due process of law. As Justice Thomas wrote in his dissent to *Johnson v. California*, 543 U.S. 499 (2005),

> When a prisoner makes a constitutional claim, the initial question should be whether the prisoner possesses the right at issue at all, or whether instead the prisoner has been divested of the right as a condition of his conviction and confinement.

*Id*. at 529 n. 3.

All that inmate Yousef seeks are the basics of due process before he is subjected to the extraordinary measures of the SAMs, *i.e.*,

> *actor*, *reus*, *judex*, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, . . .

*Den ex dem. Murray v. Hoboken Land & Improvement Co*., 59 U.S. (18 How.) 272, 280 (1855).

See also *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir. 1984) ("Due process has two indispensable components — notice and an opportunity to be heard." Citing to *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).).

It is from these fundamental, bedrock principles that all relief to inmate Yousef flows.

- 52 -

WHEREFORE, Petitioner Yousef, by and through his counsel of record, does respectfully prey that this Court grant the relief requested herein, and order the parties to appear for further proceedings, including the necessary scheduling order regarding discovery.

Respectfully submitted,

/s/ *Bernard V. Kleinman*

Bernard V. Kleinman, Esq.
Attorney for Petitioner YOUSEF

Dated: June 16, 2011
        White Plains, NY

## CERTIFICATE OF SERVICE

I do hereby certify that a true and accurate copy of the foregoing PETITION AND MEMORANDUM IN SUPPORT THEREOF was mailed on the 17 day of June, 2011, by First Class Mail, postage prepaid, and/or by express private carrier, and/or by e-mail, to the following parties, and was ECF filed with this Court:

DAVID RASKIN, ESQ.
ASS'T U.S. ATTORNEY
SOUTHERN DISTRICT OF NEW YORK
1 ST. ANDREW'S PLAZA
NEW YORK, NY 10007

/s/ *Bernard V. Kleinman*

Law Office of Bernard V. Kleinman, PLLC
Bernard V. Kleinman, Esq.
Attorney for Petitioner YOUSEF
2 Gannett Drive, Suite 418
White Plains, NY 10604
Tel. (914) 644-6660
Fax: (914) 694-1647
Email: attrnylwyr@yahoo.com